ELLA EDGINGTON, by IDA M. MEYER, her next friend, Appellee, v. THE BURLINGTON, CEDAR RAPIDS & NORTHERN RAILWAY COMPANY, Appellant.

Injuries to Child: TURNTABLE IN NEIGHBORHOOD OF STREET: *Negligence in fastening.* A railroad company maintaining a turntable on an unfenced lot, near a public alley, and which was from 80 to 300 feet from the street, is liable for injuries received by a seven year old child while playing thereon, caused by the company's failure to use reasonable care to so guard and fasten the turntable as to prevent injuries to children tempted to play on it.

SUFFICIENCY OF FASTENING: *Jury question.* Where, in an action against a railroad company for injuries received by a child while playing on defendant's turntable, it was shown that the turntable was unfastened by one of the children with plaintiff, the question of the sufficiency of the fastening used was one of fact for the jury.

CAPACITY TO APPRECIATE DANGER: *Jury question.* A child seven years and eight months old cannot be considered, as a matter of law, of sufficient age and intelligence to appreciate the

danger to which she exposed herself in playing on a railroad turntable, and such question was properly left to the jury in determining the question of contributory negligence.

CONTRIBUTION OF PLAYMATES TO INJURY. The fact that injuries received by a child while playing on a railroad turntable were immediately caused by the child's playmates unfastening and operating the turntable, does not relieve the company from liability, the gist of the action being the keeping of a dangerous machine in a place where children might reasonably be expected to resort and to play thereon.

*Appeal from Muscatine District Court.*—HON. P. B. WOLFE, Judge.

SATURDAY, APRIL 12, 1902.

ACTION at law for the recovery of damages on account of personal injury. Verdict and judgment for plaintiff, and defendant appeals.—*Affirmed.*

*Carskaddan & Burk* and *S. K. Tracy* for appellant.

*C. A. W. Kent* and *Clymer A. Coldren* for appellee.

WEAVER, J.—The defendant company owns and operates a line of railroad entering the city of Muscatine, Iowa. In connection with its station and yards at this place, it maintains and uses a turntable, a well-known machine or device for turning locomotives. This table turns about a central point or axis, and, when unfastened, is easily revolved by hand power applied to bars or levers. At and prior to the time of the accident upon which this action is based the table, when not in use, was ordinarily fastened by a pin, bolt, or latch of some kind, the exact description of which is not disclosed in the record before us. This machine stood upon an unfenced lot, owned by the defendant, near the line of a public alley, and at a distance from the street variously estimated at from 80 to 300 feet. Children of the neighborhood were to some considerable de-

gree in the habit of passing through the alley, and at times loitered and played upon and about the turntable. This practice does not seem to have been with the express knowledge or consent of the defendant, and upon at least one occasion its employes drove the children away. There was a box factory not far distant, to which also children resorted by way of the alley, and near the turntable, to gather scraps of wood for fuel. On the sixteenth day of June, 1899, the plaintiff, then a child of seven years and eight months, living in that neighborhood, started from her home, with several little girls somewhat older, intending to go to the box factory for wood. Passing down the alley, they stopped to play upon the turntable. One of them removed the bolt or catch which fastened the machine, and soon afterward two small boys arrived, and began to revolve it, while the other children rode upon the platform or frame. Under these circumstances the plaintiff in some manner stepped or fell into the space between the outer edge of the table and the wall of the pit in which it revolved, receiving severe, painful, and permanent injuries. Negligence is charged against the defendant upon the theory or claim that the turntable was a dangerous machine, and of such nature and construction as to be specially attractive to children; and that, having placed it upon an open lot near a public way, where they might reasonably be expected to pass or gather to play, it was defendant's duty to use reasonable care to so guard or fasten said machine as to prevent injury to young and inexperienced children who might be tempted to play upon it. Defendant denies that it was charged with any such duty, and denies that it failed to exercise all reasonable and proper care in the premises. It further insists that the children, in playing upon the turntable, were trespassers, and the law imposed upon the defendant no duty to exercise any care for their safety except to refrain from willful or wanton injury to them after discovering them upon its property. It

also claims that in entering upon the company's property without permission and in playing upon the turntable the plaintiff was guilty of contributory neligence, and therefore is not entitled to recover damages.

The question of the liability of a railroad company for injuries to children playing upon its turntables is one of interest and importance. During the last 30 years it has called for the consideration of many courts, both state and federal, throughout the United States, and has developed two opposing and irreconcilable lines of decisions, to which more extended reference is hereinafter made. Two cases of the kind have heretofore been presented to this court (*Carson v. Railroad Co.,* 96 Iowa, 593, and *Merryman v. Railroad Co.,* 85 Iowa, 634); but in each instance the party injured had reached an age and maturity to be properly chargeable with contributory negligence, and a recovery was denied, without considering whether the company may be held liable under other circumstances. In this case, however, the child is of such tender years that we cannot say, as a matter of law, she was guilty of negligence contributing to her own injury, and we are thus called upon for the first time to assume a position upon the controverted question. In view of its importance, and the wide divergence in the views of eminent courts and lawyers, we have endeavored to give the subject that careful attention which it deserves, and, in our judgment the conclusion at which we have arrived has the support of the greater weight of authority, and is most nearly in accord with the principles which underlie and pervade the laws of civilized society.

That the ordinary turntable is a very dangerous machine for children to play with, and possesses strong attractions for their sportive instincts, is manifest from the numerous cases of injuries thus received which come before the courts for adjudication. These cases are all strongly alike in their circumstances, and, generally speaking, the story of one is the story of all,—an open lot; a turntable insecurely fas-

tened, or wholly unfastened; children gathering upon it, some riding while others work the levers; a misstep, a fall, and a little body is maimed, or a young life is extinguished. It is useless to moralize upon the instinct for play which controls the action of a child, or argue for its control by parental authority and guidance. It exists, ingrained in the child's being, and we must deal with it as we find it. Nothing seems to appeal to it more strongly than some device in the form of a merry-go-round; and the temptation to ride it, if the opportunity offers, is practically irresistible, until approaching maturity brings some reasonable measure of judgment and discretion. Accepting these facts, we come to the vital question raised by the issue now before us: Is a landowner who exposes dangerous but attractive machinery upon an open lot in close proximity to a public way or other place where he may reasonably expect young children will pass or resort for play under any duty to fasten or guard such machinery, or to exercise care to provide against children interfering with it to their injury? The first instance in which this question, as applicable to turntables, was presented for judicial consideration, appears to have been in the federal courts. See *Stout v. Railroad Co.,* 2 Dill. 294 (Fed. Cas. No. 13,504), and the same case on appeal to the supreme court of the United States, 17 Wall. 657 (21 L. Ed. 745). In some of the reviews of this case it is assumed that this decision announces a new principle, and marks the abandonment of rules which prior thereto defined the extent of a man's dominion over his own property. This, as we shall try to demonstrate, is an error. It is true, the facts involved in the *Stout Case* were new to the courts, but the principle which controlled its decision has its root and life in the fundamental doctrines of the common law. The principle remains invariable, but its application must, of necessity, be extended and adjusted to the varying circumstances of business and of life. With the steady advance in industrial arts and sciences, the rapid expansion and diversifi-

cation of business interests, and the increasing density of population forcing men into closer contact, and compelling them, in gradually increasing measure, to yield something of individual right for the general good, there arise from day to day for settlement by the courts disputes which are without precedent in their facts and circumstances. But their settlement requires no mere judicial experimentation, for somewhere in the treasure house of the law there is to be found the principle upon which the rights of parties may be justly determined. The basic principles of our jurisprudence have their birth in the enlightened conscience and the ineradicable distinction between right and wrong, and are unchangeable; but, as we have already noted, their use and application extend and expand to meet the demands of changing conditions.

The law thus presents the seeming paradox of a structure which is at once a finished product and a ceaseless evolution, developing new strength with each new demand upon its energies. The exercise of the sovereign power of eminent domain by private citizens for private profit; the extension of railroads to every city and every hamlet; the development of electricity as a source of heat, power and light; the discovery and development of oil, gas and other riches concealed beneath the earth's surface,—are but samples of a multitude of new and vastly important interests with which the courts have had to deal as matters of first impression within the memory of living men, and in each instance the seeming chaos of conflicting rights and theories has been reduced to order, and adjusted according to old-time rules wisely construed in the light of the conditions calling for their application. Not that every case has been correctly decided, or that every judicial opinion with which the books are filled is sound; but the great body of the law, as pronounced by the courts, is alive with the spirit of justice, and its tendency is uniformly and irresistibly toward the right. The rules which assure to a person dominion over his own property and deny

protection to the trespasser in his wrong-doing are of the most ancient origin, and their justice is undisputed; but they are not entirely without limitation or restriction. Ordinarily, the owner of property, real or personal, may use or deal with it as he likes; but this right can never be divorced from the responsibility suggested by the maxim, *"Sic utere tuo alienum non laedas."* In other words, no man is at liberty, under the law, to so use his own as to endanger the person or property of his neighbor. This is a necessary result of social organization, and an indispensible requisite of social order. So long as one lives in comparative isolation, this rule rests lightly upon him, and he need scarcely feel its restraint; but, as population multiplies, and he is brought into proximity with his kind, he finds the range in which he may exercise absolute control over his own is constantly being narrowed. As a lone dweller upon the prairie, he may indulge in target shooting, may store tons of dynamite in his dwelling, may erect a slaughterhouse upon his premises, may leave undrained his malaria-breeding swamps, may leave ungarded pits and traps in his open fields; for these things affect none but himself. When neighbors arrive, or his home becomes one of the many in a city or town, he must adjust himself to the changed conditions, and at all times have due regard for the effect which his conduct in the use of his property may have upon others. Railroad companies are comparatively new entities or agencies in the world of business, but in the law they are persons, and hold and manage their property subject to the same limitations and obligations which characterize ownership in the hands of the individual citizen. But we are told that, conceding all this, the law makes no provision for the protection of a trespasser, and that he who enters unbidden upon the land of another assumes all risk of pitfalls, traps, and other sources of danger which may be there encountered, and that he who officiously or needlessly intermeddles with property of any kind to which he has no legal right has no

cause of complaint if thereby injured. This is a general rule
of unquestioned authority and justice, but, as we have said,
like other rules, is not without limitation. If the owner of
a lot build a fence around it, or if he cultivate or reside upon
it, or beautify it with lawn and ornamental shrubbery, he
gives notice to the world of his desire for its exclusive enjoy-
ment, and he who disregards this notice takes upon himself
the risk to which his trespass may expose him. If, however,
the owner take away the fence, throwing his lot open in un-
used and unimproved condition, leaving the public to swarm
over and across it and children to play upon it, he cannot be
held innocent of wrong if by his act this semi-public use of
his property is made hazardous to human life, and he fails
to take reasonable precaution against the danger thus occa-
sioned. Nor is such responsibility confined entirely to va-
cant and unused property. Assume, for instance, that a
manufacturer of merry-go-rounds desires to erect one, not
for public use, but to test the machinery, or to advertise his
business to the people passing by, and he chooses for that
purpose an open lot, owned by him, bordering immediately
upon a much-used street, or immediately adjoining the un-
fenced grounds of a primary school building. He knows that
the sight of this device with its gaudy trappings will be abso-
lutely certain to attract to it a swarm of children, who will
just as certainly play with it; and, if he leave it thus ex-
posed and unfastened, and thereby some inexperienced and
immature child is caught and crushed in the machinery, it
would be a shocking distortion of sound principle to hold that
no liability is here incurred. Nor has the law, in its wonder-
ful adaptation to the protection of order and promotion of
right conduct, waited for the advent of turntables before
settling the rule which governs this case. The rule did·not
have its origin in the *Stout Case,* nor is its application to turn-
table accidents an exceptional proposition by which the rail-
road companies are singled out for a liability which does not,

under similar circumstances, attach to every property owner. For many years the courts have been gradually approaching unanimity upon the idea that the law which withdraws its protection from the trespasser applies to the unheeding infant with less harshness than to the adult, and under some circumstances does not apply in any degree. So, too, the once prevalent doctrine, based upon mistaken precedent rather than principle, which held the unconscious child by imputation or substitution guilty of the negligence of its parent, has been relegated in most jurisdictions to its proper place among the barbarisms from which the law has happily been redeemed.

Let us now turn to some of the leading authorities bearing upon this discussion. No case directly bearing upon the duty which a property owner may owe to an infant (even when such child is technically a trespasser) has been more often quoted than *Lynch v. Nurdin,* 1 Q. B. 29. The facts giving rise to this case were as follows: The defendant, being the owner of a horse and cart, left them standing unhitched in the street while he entered a shop. During his temporary absence a little child climbed into the cart, while another undertook to lead the animal, with the result that an accident occurred, and the child upon the cart was injured. The court held the defendant liable, Lord Denman pronouncing the judgment. It is there said: "Suppose  *  *  * the plaintiff merely indulged the natural instinct of a child in amusing himself with an empty cart and deserted horse. *  *  * The defendant cannot be permitted to avail himself of that fact. His most blamable carelessness  *  *  * having tempted the child, he cannot blame the child for yielding to that temptation." Speaking also of the claim that the plaintiff could not recover because of contributory negligence, Lord Denman says: "The child, acting without prudence or thought, has, however, shown these qualities in as great a degree as he could be expected to possess them." That this decision was not at once recognized by all English courts is

shown by the later case of *Mangan v. Atterton,* L. R. 1 Exch.
239, in which a child was denied damages for injuries re-
ceived while meddling with a machine left unguarded upon
the street.   The reason made use of to justify this result has
been the subject of severe criticism, and is now, in effect,
overruled by *Clark v. Chambers,* 3 Q. B. Div. 327, where it is
said: "It appears to us that a man who leaves in a public
place, along which persons, and among them children, have
to pass, a dangerous machine, which may be fatal to one
who touches it, is not only guilty of negligence, but negli-
gence of a very reprehensible character."   Of *Mangan v.
Atterton* it is said by an able law writer, "Nothing worse
than this as a specimen of judicial reasoning can be found in
the reports."   Beach, Contributory Negligence 139; and a
like opinion is expressed in Thompson, Negligence 1045.   In
*Abbott v. Macfie,* 2 Hurl. & C. 744, we have a somewhat pe-
culiar case. A property owner had set up a shutter on his own
premises, but without secure fastening, near where children
were wont to play.   A child tampered with the bolt, and the
shutter falling, injured both this child and another.   The lat-
ter was permitted to recover damages, the court saying that,
while the fastening was sufficient for ordinary purposes, yet,
"having regard to the risks to which, in the locality where it
was, it was exposed," the jury was authorized to find the
owner negligent.   The other child was not allowed to recover,
because of its direct interference with the shutter,—a nice
distinction, which, assuming both children to be too young to
exercise care or prudence, few courts of this day would be
willing to follow.   The relaxation of the strict rule of the
law in favor of children is again to be noted in *Jewson v.
Gatti,* 2 Times Law R. 441.   Here a little girl, loitering by
the way, was looking into a cellar, where persons were en-
gaged in scene painting.   While thus engaged a railing
against which she leaned broke, and precipitated her into the
area.   In discussing the case the court uses the following
language:  "There was painting going on in the cellar, and

it must have been known that painting would attract children; and then a bar was put up, ostensibly as a protection, against which children would naturally lean while looking down into the cellar. This was almost an invitation—certainly an inducement—to the children to lean against the bar." In *Harrold v. Walney,* 78 Law T. (N. S.) 788, decided by the English court of appeals in 1898, the doctrine of *Lynch v. Nurdin* is expressly approved; the court saying of it, "That case has never been overruled or questioned." The authority is there cited in support of the right of action for damages in a child who was injured by the falling of a rotten fence upon which it climbed by the road side, and, among other things, the court says: "When considering whether the nuisance was the cause of the accident, it is a good test to see whether what the child did was something which ought to have been present to the mind of the defendant as a possible and probable result of leaving the fence in a dangerous condition." But, whatever may be said as to the prevailing rule in England, the doctrine of *Lynch v. Nurdin* has been followed with very little dissent in this country. To this point we have the authority of Mr. Beach (see Beach, Contributory Negligence 141) for the statement that the supreme judicial court of Massachusetts "is the only court in this country which has not affirmed *Lynch v. Nurdin,*" and our own investigation tends to confirm the assertion although in some states the principle involved has been obscured by inconsistent decisions. *Birge v. Gardiner,* 19 Conn. 507 (50 Am. Dec. 261); *Brennan v. Railroad Co.,* 45 Conn. 284 (29 Am. Rep. 679); *Car Co. v. Cooper,* 60 Ark. 541 (31 S. W. Rep. 154, 46 Am. St. Rep. 216); *Harriman v. Railroad Co.,* 45 Ohio St. 507 (12 N. E. Rep. 451, 4 Am. St. Rep. 507); *Hydraulic Works v. Orr,* 83 Pa. 322; *Schilling v. Abernathy,* 112 Pa. 437 (3 Atl. Rep. 792, 56 Am. Rep. 320); *Kinchlow v. Elevator Co.,* 57 Kan. 374 (46 Pac. Rep. 703); *Price v. Water Co.,* 58 Kan. 551 (50 Pac. Rep. 450, 62 Am. St. Rep. 625); *Schmidt v. Distilling Co.,*

90 Mo. 284 (1 S. W. Rep. 865, 2 S. W. Rep. 417, 59 Am. Rep. 16); *City of Pekin v. McMahon,* 154 Ill. 141 (39 N. E. Rep. 484, 27 L. R. A. 206, 45 Am. St. Rep. 114); *Siddal v. Jansen,* 168 Ill. 43 (48 N. E. Rep. 191, 39 L. R. A. 112); *Coppner v. Pennsylvania Co.,* 12 Bradw. 600; *Young v. Harvey,* 16 Ind. 314; *Railroad Co. v. Pitzer,* 109 Ind. 183 (10 N. E. Rep. 70, 58 Am. Rep. 387); *Bramson's Adm'r v. Labrot,* 81 Ky. 638 (50 Am. Rep. 193); *Railroad Co. v. Gastineau's Adm'r,* 83 Ky. 119; *Passameneck's Adm'r v. Railroad Co.,* 98 Ky. 205 (32 S. W. Rep. 620); *Mackey v. City of Vicksburg,* 64 Miss. 178 (2 South. Rep. 178); *Power v. Harlow,* 53 Mich. 514 (19 N. W. Rep. 257, 51 Am. Rep. 154; *Power v. Harlow,* 57 Mich. 107 (23 N. W. Rep. 606); *Tully v. Railroad Co.* (Del. Sup. 47 Atl. Rep. 1019, 82 Am. St. Rep. 425); *Westerfield v. Levis,* 43 La. Ann. 63 (9 South. Rep. 52); *Railroad Co. v. McDonald,* 152 U. S. 262 (14 Sup. Ct. Rep. 619, 38 L. Ed. 434); *Railroad Co. v. Snyder,* 18 Ohio St. 399 (98 Am. Dec. 175); *Gunderson v. Elevator Co.,* 47 Minn. 161 (49 N. W. Rep. 694); *Biggs v. Barb Wire Co.,* 60 Kan. Sup. 217 (56 Pac. Rep. 4, 44 L. R. A. 655); *Woods v. Trinity Parish,* 21 D. C. 540; *Hutson v. King,* 95 Ga. 271 (22 S. E. Rep. 615); *Barnes v. Ward,* 9 C. B. 420, 2 Car. & K. 661; *Lowe v. Sall Lake City,* 13 Utah, 91 (44 Pac. Rep. 1050, 57 Am. St. Rep. 708); *Morrow v. Sweeney,* 10 Ind. App. 626 (38 N. E. Rep. 187); *Marble v. Ross,* 124 Mass. 44; *Daley v. Railroad Co.,* 26 Conn. 591 (68 Am. Dec. 413); *Kopplekom v. Cement Pipe Co.* — Colo. App. — (64 Pac. Rep. 1047); *Ricketts v. Village of Markdale,* 31 Ont. 610.

Some critics have sought to weaken the force of *Lynch v. Nurdin,* and to distinguish it from the line of cases to which we have referred, by saying that in the former the child was in the public street, and therefore the rule as to trespassers did not apply to it. The suggestion is fallacious and misleading. The cart was also on the public street. It

was rightfully there; and the child, when he climbed into it without leave, was as much a trespasser in the eye of the law as it was possible that a child of its years could be,—as much, indeed, as if he had wandered across the boundary line of defendant's land. The defendant was held liable not because the plaintiff was not a trespasser, nor because the horse and cart were not rightfully upon the street, but because he knew, or, as a reasonable man, ought to have known, that in thus leaving his property exposed he was offering a dangerous temptation to the thoughtlessness of childhood, and used no care to prevent injury therefrom. None of the many precedents we have above cited are turntable cases and in nearly every instance the injured person was a technical trespasser. They unite, however, in giving vigorous expression to the rule that whether the attractive character of the danger and its unguarded condition are to be construed as an implied invitation to the child to enter upon the property of another; or whether such use of one's own property is a violation of the fundamental doctrine requiring the owner to have a care that his neighbor suffers no harm at his hands, no man, even upon his own premises, may rightfully expose to the approach of young children a temptation which is likely to attract them into danger, without using care to avoid their injury. It by no means follows that a property owner is an insurer of the safety of children who come upon his premises. His obligation is simply that which attaches to every member of society when he undertakes to exercise a personal right in a manner which may affect the welfare or safety of another member,— the obligation of reasonable care. Discharging that obligation, he has done his duty, and assumes no liability, whatever happens; but, failing therein, he is justly responsible for the effects of his negligence. In *Birge v. Gardner, supra,* —a Connecticut case,—the defendant placed a heavy gate upon his own land on or near the border of a private lane, where children were wont to pass. A child took hold of the gate, and it fell upon him. It was held a proper case for the

jury to say "whether such child ought to be chargeable with
fault, so as to defeat its recovery, or whether the acts done
by him were not the result of childish instinct, which the de-
fendant might easily have foreseen." In *Hydraulic Works
v. Orr,*—a Pennsylvania case,—the defendant was the pro-
prietor of a factory within the limits of a city. For its pri-
vate use it maintained an alley, closed with gates, upon which
the words "Private" and "No Admittance" were conspicu-
ously posted. In the alley was a heavy platform, so hinged
as to be lifted and lowered for some purpose in connection
with the business. The gate was sometimes left open, and on
one such occasion several small children strayed into the
alley, and were playing under the upraised platform, when
it fell, crushing them with its weight. The court says: "It is
true, that, where no duty is owed, no liability arises; * * *
but it has often been said duties arise out of circumstances.
Hence where the owner has reason to apprehend danger, ow-
ing to the situation of his property and its openness to acci-
dent, the rule will vary. * * * Can it be righteously said
that the owner of such a dangerous trap, held by no fasten-
ing, so often left open and exposed to the entry of persons on
business, by accident or from curiosity, owes no duty to those
who will probably be there? The common feeling of man-
kind, as well as the maxim, *'Sic utere tuo ut alienum non
laedas,'* say this cannot be true; that this spot was not so pri-
vate or secluded as that a man may keep dangerous pits and
deadfalls there without a breach of duty to society. On the
contrary, the mind, impelled by the instincts of the heart, sees
at once that in such a place, and under these circumstances,
he had good reason to expect that some day or other some one
—probably a thoughtless boy in the buoyancy of play—would
be led there, and injury would follow; especially, too, when
prompted by knowledge that a fastening was needed." In a
later case, *Gramlich v. Woesl,* 86 Pa. St. 74 (27 Am. Rep.
684), while holding the circumstances insufficient to entitle

plaintiff to recover, the court say of *Hydraulic Works v. Orr*:
"No case was ever more justly decided   *   *   *   The children
were trespassers certainly; but then . they were children,
and the defendants were bound to have regard to the reckless
and thoughtless tastes and traits of childhood." The *Kansas*
court (*Price v. Water Co., supra*), applying the rule to the
owner of a reservoir which was so constructed that a person
falling into it or entering it could not easily escape, by rea-
son of which a young boy was drowned, makes use of this
language: "Without doubt the common law exempts the
owner of private grounds from obligation to keep them in
safe condition for the benefit of trespassers, idlers, and others
who go upon them not by invitation, express or implied, but
for pleasure, or through curiosity. The common law, how-
**ever,** does not permit the owner of private grounds to keep
thereon allurements to the natural instincts of human or ani-
mal kind without taking reasonable precautions for the safety
of such as may thereby be attracted to his premises.   To
maintain upon one's own property enticements to the ignor-
ant or unwary is tantamount to an invitation to visit and in-
spect and enjoy, and in such cases the obligation to endeavor
to protect from the dangers of the seductive instrument or
place follows as justly as though the invitation had been ex-
press." The same principle was approved in a somewhat
similar case by the supreme court of Illinois. *City of Pekin
v. McMahon, supra.* The question engaged the attention of
the Kentucky court in a case (*Bramson's Adm'r v. Labrot,
supra*) where the defendant piled lumber upon his own land,
where children were in the habit of playing. One of the
piles, being negligently built, fell, killing plaintiff's young
son. The rule is there expressed as follows: "As a general
rule, the owner of land may retain to himself the sole and
exclusive occupation of it; but, as property in lands depends
upon municipal law for its recognition and protection, the
individual use and enjoyment of it are subject to the condi-

tions and restraints imposed by the public good and reason-
able and humane regard for the welfare and rights of others.
Hence, according to the maxim, *'Sic utere,'* etc., a party may
be made liable for the negligent use of his property whereby
the person or property of another has been injured.  It has
been held that a party is guilty of negligence in leaving any-
thing in a place where he knows it to be extremely probable
that some other person will unlawfully set it in motion to the
injury of a third person.  *  *  *  It is a reasonable and
necesary rule that a higher degree of care should be exercised
toward a child incapable of using discretion commensurate
with the perils of his situation than one of mature age and
capacity; hence conduct which, toward the general public,
might be up to the standard of care, may be gross or willful
negligence when considered in reference to children of tender
age and immature experience.  While, therefore, the owner of
land is not bound to provide against remote and improbable
contingencies resulting in injuries to children trespassing
thereon, there is a class of cases which hold owners liable to
children, although trespassing at the time, when, from the pe-
culiar nature and exposed position of the dangerous defect or
agent, the owner should reasonably anticipate such an injury
to flow therefrom as actually happened."  In a later case
(*Railroad Co. v. Gastineau's Adm'r, supra*) the same court
says: "Undoubtedly children of tender years should not be
treated strictly as trespassers when, guided by childish in-
stincts, they stray upon the tracks or into the yard of a rail-
road.  *  *  *  One may incur liability for an injury to a
child of tender years by leaving machinery where it is acces-
sible to him, although there would be no liability to an adult,
or child of years of discretion, under like circumstances.
*  *  *  A child without discretion, although a trespasser,
occupies a legal attitude to the company similar to that of an
adult when not a trespasser.  *  *  *  Of course, we do not
mean to say that a railroad company is an insurer against

accidents to children for accidents to them which cannot well be foreseen; but, if they are of such tender years as to be devoid of discretion, then justice and the dictates of humanity require the exercise of reasonable care to prevent their being placed in danger, even though they may be technically trespassers." The Mississippi court, in the case of the death of a child by falling into an excavation, says (*Mackey v. City of Vicksburg, supra*): "Whether what was done was reasonably calculated to entice a child, following its instincts of curiosity or love of liberty, to escape from the yard, and enter upon the dangerous path, is determinable as a question of fact, and not of law. If the defendant, by the exercise of reasonable forethought, could have anticipated the probability of the child's action, it should have guarded against the danger. * * * If it failed to do so, it failed in a duty which rested upon it, even though the child was a trespasser in going upon the premises." In a Tennessee case (*Whirley v. Whiteman*, 1 Head, 614) the defendant was the owner of a mill standing upon his own premises and 20 feet away from the street. Upon the outer wall of the mill, near the ground, was some uncovered gearing. Children sometimes played in the space between the mill and street, and a child of three years, being attracted to the place, was caught in the wheels. Judgment for defendant in the trial court was reversed upon appeal, the court saying: "We are of the opinion that the verdict is against the evidence. According to the maxim of the common law, '*Sic utere*,' etc., every person is held responsible in law for the consequences of his own negligence." The Indiana court speaks of the same doctrine (*Railroad Co. v. Pilzer, supra*) as follows: "This is a reasonable and humane rule, and any other would be a reproach to the law. But the law merits no such reproach, for throughout all its branches, whether tort or contract, there runs, like the marking red cord of the British navy, a line distinguishing children of too few years to have judgment or discretion from those old enough to exercise those faculties. This is a doctrine taught

by every man's experience and sanctioned by law. A departure from it would shock every one's sense of justice and humanity." In the same court, *Penso v. McCormick,* 125 Ind. 116 (25 N. E. Rep. 156, 9 L. R. A. 313, 21 Am. St. Rep. 211), the defendants deposited ashes containing fire in their own mill yard, where children were in the habit of playing, and were held in damages to a young boy who was thereby burned. It is there said: "It is a well-recognized doctrine that persons are required to use greater care in dealing with children of tender years than with older persons, who have reached the age of discretion, and that greater care is required to avoid injury to them even when they are trespassers." This doctrine was also approved by the Michigan court (*Power v. Harlow, supra*) in an opinion written by Judge Cooley, the magnitude of whose fame and the weight of whose authority are unexcelled in modern jurisprudence. The defendant in that case had left a box of dynamite cartridges under an open shed on his own land, but near a path along which his tenant's young son had occasion to pass. The boy's attention being attracted to the box, he went to it, removed the cover, took out a cartridge, and was injured by its explosion. The court says: "Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are charged with a duty of care and caution toward them must calculate upon this, and take precautions accordingly. If they leave exposed to the observation of children anything which would be tempting to them, and which they, in their immature judgment, might naturally suppose they are at liberty to handle or play with, they should expect that liberty to be taken." On a second appeal of the same case Judge Cooley again pronouncing the opinion, the court approved the following instruction to the jury: "If therefore, you find that the box containing these explosives was placed under the shed in question, and was placed there in such a manner that children who had the right to pass to and fro near it might, in following out their childish instincts, go to

it, and get at its contents, I charge you it would be an act of negligence for which he [defendant] would be liable." In a late case in the United States supreme court (*Railroad Co. v. McDonald, supra*) this doctrine is again enforced against the owner of a coal mine, which deposited its slack in an open space near a path upon its own land, where it was permitted to burn, and a boy was injured by falling into it. In holding the defendant liable, the court quotes approvingly the language of Lord Denman: "If I am guilty of leaving anything dangerous in a place where I know it to be extremely probable that some other person will wrongfully set it in motion to the injury of a third, and if that injury be so brought about I presume that the sufferer might have redress against both or either of the two, but unquestionably against the first. * * * In the present case there was no express invitation to the plaintiff to come upon the premises of the railroad company for any purpose but, if the company left its slack pit without a fence or anything to give warning of its really dangerous condition, and knew, or had reason to know, that it was in a place where it would attract the interest or curiosity of passers, can the plaintiff, a boy of tender years, be regarded a mere trespasser for whose safety and protection, while on the premises, against the unseen danger referred to, the railroad company was under no obligation to make provision?" This question the court answered in the negative, and affirmed the judgment against the defendant.

This somewhat extensive citation of authorities, though but part of the many bearing in the same direction, we have thought necessary in view of the claim persistently put forth by those who reject the authority of the *Stout Case* that it is not in harmony with the general principles of the law, and holds railroad companies to a stricter measure of liability than is applied to natural persons. Taking up now the turntable cases proper, we find the pioneer case just referred to was tried at circuit court before that distinguished jurist

Judge Dillon.   2 Dill. 294, Fed. Cas. No. 13,504.   From
his charge to the jury, which was affirmed on appeal, we
quote: "Now, the ground of complaint is that the turntable,
as it was constructed, was of dangerous nature or character
when unlocked or unguarded; and that, being, as alleged, in
a place much resorted to by the public, and where children
were wont to go and play, it was the duty of the defendant
to keep the same securely locked or fastened, so as to prevent
it from being turned or played with by children, or to keep
the same guarded so as to prevent injuries such as befell the
plaintiff.   The basis of the action, therefore, is that
defendant owed plaintiff a duty of this kind, and that defend-
ant, in failing to discharge this duty, was guilty of negligence.
*   *   *   The machine in question is part of defendant's
road, and was lawfully constructed where it was.   If the
company did not know, and had no good reason to suppose,
that children would resort to the turntable to play, or did not
know, or had no good reason to suppose, that they would be
likely to get injured thereby, then you can find no verdict
against it.   *   *   *   But if defendant did know, or had good
reason to believe, under the circumstances of the case, the
children of the place would resort to the turntable to play,
and that, if they did, they would or might be injured, then
if they took no means to keep the children away, and no
means to prevent accident, they would be guilty of negligence,
and answerable for damages caused to children by such neg-
ligence."   This judgment, upon appeal (17 Wall. 657, 21 L.
Ed. 745), was unanimously affirmed by the supreme court of
the United States, and its authority is reaffirmed in *Railroad
Co. v. McDonald, supra.*   The authority of this precedent has
had the express recognition of the courts of every state west
of the Mississippi having occasion to pass upon a like ques-
tion, as well as a large portion of the courts east of that line.
Indeed, the courts of New Hampshire, Massachusetts, and
New York, and more recently the courts of New Jersey and
Michigan, are all that seem to be committed to the opposing

view; and even in each of these states, unless we except New
Hampshire and Massachusetts, the principle which underlies
the *Stout Case* had often been applied to other than turntable·
accidents. In California, *Barrett v. Railroad Co.,* 91 Cal.
296 (27 Pac. Rep. 666, 25 Am. St. Rep. 186), the court, re-
ferring to *Frost v. Railroad Co.,* 64 N. H. 220 (9 Atl. Rep.
790, 10 Am. St. Rep. 396),—a leading authority in opposi-
tion to the *Stout Case,*—says: "In our judgment, the rule,
as broadly announced in that case, cannot be maintained
without a departure from well-settled principles. It is a
maxim of the law that one must so use and enjoy his prop-
erty as to interfere with the comfort and safety of others as
little as possible. This rule, which only imposes a just re-
striction upon the owner of property, seems not to have been
given due consideration in the case referred to. . But this
principle, as a standard of conduct, is of universal applica-
tion, and the failure to observe it in respect to those who have
a right to invoke its protection is a breach of duty, and, in a
legal sense, constitutes negligence. * * * If the defend-
ant ought reasonably to have anticipated that, leaving this
turntable unguarded and exposed, an injury such as plaintiff
suffered was likely to occur, then it must be held to have an-
ticipated it, and was guilty of negligence in maintaining it
in its exposed position. It is no answer to this to say that the
child was a trespasser, and, if it had not intermeddled with
defendant's property, it would not have been hurt, and that
the law imposes no duty on the defendant to make its prem-
ises a safe playground for children. In the forum of the law
as well as of common sense a child of immature years is ex-
pected to exercise only such care and self-restraint as belongs
to childhood; and a reasonable man is presumed to know this,
and is required to govern himself accordingly." The rule
was reaffirmed by the same court in *Callahan v. Railroad Co.,*
92 Cal. 89 (28 Pac. Rep. 104). In *Kansas Cent. R. Co. v.
Fitzsimmons,* 22 Kan. 691 (31 Am. Rep. 203), the rule is
thus stated: "No person has a right to leave, even on his

own land, dangerous machinery, calculated to attract and entice boys to it, there to be injured, unless he take proper steps to guard against the danger; and any person who does thus leave dangerous machinery exposed without first providing against all danger is guilty of negligence. It is a violation of the beneficial maxim, '*Sic utere*,' etc." In Minnesota, *Keffe v. Railway Co.*, 21 Minn. 207 (18 Am. Rep. 393), the same result is reached on a full discussion of the principle largely independent of the *Stout Case*. The court says: "Now, what an express invitation would be to an adult the temptation of an attractive plaything is to a child of tender years. If the defendant had left its turntable unfastened for the purpose of attracting young children to play upon it, knowing the danger into which it was alluring them, it would certainly be no defense to an action by the plaintiff, who had been attracted upon the turntable and injured, to say that the plaintiff was a trespasser, and that his childish instincts were no excuse for his trespass. In *Townsend v. Wathen,* 9 East, 277, it was held unlawful for a man to tempt even his neighbor's dogs into danger by setting traps on his own land with strong-scented meat, by which the dogs were allured to come upon his lands and into his traps. In that case Lord Ellenborough asks: 'What is the difference between drawing the animals into the trap by his natural instincts, which he cannot resist, and putting him there by manual force?' And Grose, J., says: 'A man must not set traps of this dangerous description in a situation to invite his neighbor's dogs, and, as it were, compel them, by their instinct, to come to the traps.' * * * The defendant therefore knew that by leaving this turntable unfastened and unguarded, it was not merely inviting young children to come upon the turnable, but was holding out an allurement, which, acting upon the natural instincts by which such children are controlled, drew them, by those instincts, into a hidden danger; and, having thus knowingly lured them into a place of danger without

their fault (for it cannot blame them for not resisting the temptation it has set before them), it was bound to use care to protect them from the danger into which they were thus led, and from which they could not be expected to protect themselves. We agree with the defendant's counsel that a railroad company is not required to make its land a safe playground for children. * * * We merely decide that when it sets before young children a temptation—one which it has reason to believe will lead them into danger—it must use ordinary care to protect them from harm. What would be proper care must, in general, be a question for the jury upon all the circumstances of the case." In *Kolsti v. Railroad Co.*, 32 Minn. 134 (19 N. W. Rep. 655), cited by defendant in the present case, a judgment for the defendant was sustained, and an instruction to the jury that the company was not bound to so fasten its turntable as to make it impossible for children to unfasten it was sustained, the duty of the company being only to exercise reasonable care. In a later decision—*Twist v. Railroad Co.*, 39 Minn. 167 (39 N. W. Rep. 402, 12 Am. St. Rep. 626)—the plaintiff was not permitted to recover, because he was evidently of sufficient age to exercise care and discretion for himself; but in announcing its decision the court expressly disapproves of the New Hampshire doctrine, which applies to a young child the rule that a trespasser cannot recover damages for injuries received, and adds: "Applied to one of sufficient mental capacity to be a conscious trespasser, this is undoubtedly a sound rule, but, if applied to children of tender years, strictly *non sui juris*, it would seem harsh and inhuman. Properly qualified, and limited in its application, the doctrine of the *Keffe Case* is, in our judgment, in accordance with the reason and the dictates of humanity." To the same effect is the opinion in *O'Malley v. Railroad Co.*, 43 Minn. 289 (45 N. W. Rep. 440).

Upon the strength of some of the language employed in the *Twist Case* it has been asserted that the Minnesota court

has limited the application of the rule of the *Stout Case* to turntable cases alone. In *Stendal v. Boyd,* 67 Minn. 279 (69 N. W. Rep. 899), the court takes occasion to correct this error; saying: "We did not mean [by what was said in the *Twist Case*] that we would not apply the doctrine to any but turntable cases, but merely that we would not extend the doctrine to cases which upon their facts, did not come strictly and fully within the principle upon which those cases rest." Sustaining the same doctrine, see *Ferguson v. Railroad Co.,* 75 Ga. 637; *Ferguson v. Railroad Co.,* 77 Ga. 102; *Railway Co. v. Dunden,* 37 Kan. 1 (14 Pac. Rep. 501); *Koons v. Railroad Co.,* 65 Mo. 592; *Nagel v. Railroad Co.,* 75 Mo. 653 (42 Am. Rep. 418); *Bridger v. Railroad Co.,* 25 S. C. 24; *Railway Co. v. Simpson,* 60 Tex. 103; *Railway Co. v. McWhirter,* 77 Tex. 358 (14 S. W. Rep. 26, 19 Am. St. Rep. 755); *Railroad Co. v. Bailey,* 11 Neb. 332 (9 N. W. Rep. 50); *Navigation Co. v. Hedrick,* 1 Wash. 446 (25 Pac. Rep. 335, 22 Am. St. Rep. 169).

The Illinois courts are sometimes quoted as being in line with those opposing the doctrine of the *Stout Case,* but this is a mistake. It is true that in a turntable case decided in that state (*Railroad Co. v. Bell,* 81 Ill. 76 (25 Am. Rep. 269) the plaintiff was not allowed to recover, but the refusal was expressly placed upon the ground that the turntable was shown to be so far removed from any public place, and was so secluded, that it could not properly be said to offer any temptation to children to trespass upon it. The same court, in a later case (*City of Pekin v. McMahon, supra*), takes occasion to approve the *Stout Case,* and cites the *Bell Case* as in effect so holding. Again, in *Siddal v. Jansen, supra,* and in *Coppner v. Pennsylvania Co., supra,* the principle is expressly approved and followed.

The principal cases which are out of harmony with the cases we have cited are *Frost v. Railroad Co.,* 64 N. H. 220 (9 Atl. Rep. 790, 10 Am. St. Rep. 396); *Daniels v. Railroad*

*Co.,* 154 Mass. 349 (28 N. E. Rep. 283, 13 L. R. A. 248, 26 Am. St. Rep. 253); *Walsh v. Railroad Co.,* 145 N. Y. 301 (39 N. E. Rep. 1068, 27 L. R. A. 724, 45 Am. St. Rep. 615); *Railroad Co. v. Reich,* 61 N. J. Law 635 (40 Atl. Rep. 682, 41 L. R. A. 831, 68 Am. St. Rep. 727). A late case from Michigan—not a turntable case, however—also holds adversely to the doctrine of the *Stout Case.* *Ryan v. Towar,* —Mich.—(87 N. W. Rep. 644). This decision was by a bare majority of the court, and, in our judgment, the dissenting opinion by Montgomery, C. J., is supported by the stronger reasoning and a greater weight of authority. These cases are founded upon the one unvarying proposition that, without regard to the age of the trespasser,—whether a mature adult or a creeping infant,—he is in law a wrongdoer, and the landowner owes him no duty except to refrain from his willful or wanton injury after discovering his intrusion upon the premises; and that, too, without regard to the temptations or enticements which the premises may offer to the childish mind. Hence, if a child too young to have any conception of right or wrong or of the ownership of property, is attracted across the boundary of an unfenced lot by a piece of dangerous and attractive machinery left there exposed without guard or fastening, and such child, led by an instinct as powerful and controlling as that which led the dog into the trap as hereinbefore referred to, is caught and mutilated in the machine, the owner is charged with no liability, although he well knew the habit of children to use the lot as a playground, and as a reasonable man must have known they would be tempted to play with the machine, and, if they yielded to the temptation, were sure to be injured. Not only this, but if one child is caught in the trap thus set, and another, seeing its peril, runs to its rescue, and in his work of mercy is also caught in the relentless machine and injured, he, too, is without remedy because, forsooth, he is a trespasser, and should politely have waited outside of the boundary until he had received due permission to enter and go to

the relief of his playmate. That this is no exaggeration, see *Railroad Co. v. Reich* and *Ryan v. Towar,* above cited, in both of which cases the plaintiff was injured in attempting to save a younger child from the death to which the defend- ant's carelessness had exposed him, but was sent from the court without redress, because, in answering a call of duty as imperative as the voice of God, she had made herself a "trespasser!" If this be the law, it well merits the witty thrust which Mr. Beach administers the doctrine of imputed negligence: "On the one hand, it is held that the negligence of a person having charge of the child is the negligence of the child, and imputable to it when the child comes into a court of justice and asks damages for an injury negligently inflict- ed upon him by the defendant. *Waite v. Railway Co.*, El., Bl. & El. 719, and *Hartfield v. Roper,* 21 Wend. 615 (34 Am. Dec. 273). But *per contra,* where a donkey is carelessly run down in the highway, where it is negligently exposed, the defendant is held liable (*Davies v. Mann,* 10 Mees. & W. 546); and, though oysters are negligently placed in a river bed, it is an injury redressible in damages for a vessel negli- gently to disturb them (*Mayor, etc., of Borough of Colches- ter v. Brooke,* 7 Q. B. 377). It appears, therefore, that the child, were he an ass or an oyster, would secure a protection which is denied him as a human being of tender years in such jurisdictions as enforce the English or New York rule in this respect." Beach, Contributory Negligence (Crawford's Ed.) 127.

Of the cases referred to as opposing the doctrine to which we adhere, one of the earliest and most often quoted is *Frost v. Railroad Co., supra.* The writer of that opinion sees in the principle for which we contend great hardship for the land owner and a source of peril to him in every fruit tree, ladder, fence, and blueberry thicket upon his premises. This language is cited with approval by most courts following that decision, and, in addition thereto, *Ryan v. Towar* vividly

depicts the woes which children inflict upon society in general. We quote: "There are no more lawless class than children, and none more annoyingly resent an attempt to prevent their trespasses. The average citizen has learned that the surest way to be overrun by children is to give them to understand that their presence is distasteful. The consequence is that they roam at will over private premises, and, as a rule, this is tolerated so long as no damage is done. The remedy which the law affords for trifling trespasses of children is inadequate. No one ever thinks of suing them, and an attempt to remove a crowd of boys from private premises by gently laying on of hands, and using no more force than is necessary to put them off, would be a roaring farce, with all honor to the juveniles." If this sweeping indictment of boyhood and these gloomy prophesies are intended as a sober argument, they demonstrate a failure upon the part of the authors to fairly interpret the doctrine against which they array themselves; and, if intended as sarcasm, it is proper to observe that there is not a rule known to the law, no matter how sacred or universally recognized, which cannot, by an extreme and exaggerated application of its principle, be made to appear ridiculous. But what, in fact, are the workings of the doctrine thus strongly depreciated? For many years the rule of *Lynch v. Nurdin, Birge v. Gardiner, Stout v. Railroad Co.,* and *Harriman v. Railroad Co.* has been recognized as authority in a large majority of the states. Can it truthfully be said that youthful trespassers are any more annoying, or the ownership of property any more burdensome, in Connecticut, Ohio, Kansas, and Minnesota than in New Hampshire, New York, New Jersey, and Michigan? We think the question will receive a negative answer in every unprejudiced mind.

Returning to our quotation from the *Michigan Case,* it is sufficient to say that the hoodlums there described find no immunity or protection in the law as we interpret it. Their mental acuteness is open to no discount or disparagement.

They know the difference between right and wrong, and understand the meaning of trespass as well as the property owner.   Ordinarily, they are at no loss to care for themselves. They disregard property right from mere love of mischief, and take risks out of mere bravado, or in conscious defiance of moral and legal restraint.   When a boy is thus injured, we may pity his folly, but justly say, as the law says, that, having intelligently assumed the risk, he ought not to recover damages.   This has no application whatever to infants who are yet without judgment or discretion, and the argument built upon such circumstances is wholly irrelevant to the question in controversy.   The majority opinion in the *Ryan Case* gives evidence that, while declaring fealty to what it believes the law, it recognizes the rule to which it adheres as being inconsistent with the spirit of civilization, of which law is, and ever must be, the foundation and framework.   It says: "However Draconic the common-law rule may be considered, it is the province of the courts to enforce it until it is changed by the legislature." Draconic, indeed, if the interpretation given in that opinion is correct; but we prefer to believe, as we think a careful investigation justifies us in believing, that the common law does not deserve the reproach thus laid at its door, and that no act of legislature is required to make it reasonable and humane.   Montgomery, C. J., in his dissenting opinion, well says:   "You may call the doctrine of these cases [turntable cases] the result of evolution of the law, or what you please.   It is a humane doctrine. *   *   *   And I do not feel justified in ignoring the overwhelming weight of authority which makes for this rule, as well as the expressions of our own court."   It is noticeable that in the two cases last cited—*Ryan v. Towar* and *Railroad Co. v. Reich*—there is expressed a solicitude for the protection of a defendant in a case of this kind from "the risk of having the question of his negligence left to a sympathetic jury."   Without for an instant denying or deprecating the inherent power of a court of record to direct a verdict when

the case warrants it, or to set aside a verdict which is palpably wrong, we venture the opinion that it is not the province of the courts to stand between a defendant and a jury of his countrymen upon a fair question of fact in an action at law, nor to give the probable sympathies of a jury any weight or influence in determining the question of his liability.

The courts upon whose decisions appellants rely go also to the extent of holding that long, open, and notorious use by the public of a beaten path across a railroad track or a vacant lot, without objection from the owner, makes him who ventures to travel such a path none the less a trespasser, and imposes no duty upon the owner to consider his safety.    In the language of *Ryan v. Towar*:  "The pedestrians who insist upon risking their lives by making a footpath of a railroad track and others who habitually shorten distances by making footpaths across the corners of village lots are none the less trespassers because the owners do not choose to resent such intrusion."    This court has already refused to follow such precedent.  *Clampit v. Railroad Co.,* 84 Iowa, 71; *Thomas v. Railroad Co.,* 103 Iowa, 649.   These cases, while not directly in point with the facts of the one now before us, have a legitimate bearing upon the principle involved, and indicate that the extreme theory of the law of trespass which obtains in those jurisdictions is not the law of this state. See, also, *Scott v. Railroad Co.,* 112 Iowa, 54.

It is profitless to discuss further the decisions of the courts.  We have thus far referred only incidentally to the text writers, but the gravity of the question renders it proper to make some reference to the views of authors of repute. This we do by direct quotation without comment:  "It is negligent to leave a dangerous instrument in a place of public access, where persons are expected to be constantly passing and repassing, and where such persons are not required to be on their guard, or where children are accustomed to play." Wharton, Negligence, section 112.  "It is no defense to a suit for negligence in leaving a dangerous machine in a place

frequented by children that a child hurt in the machine was a trespasser." Wharton, Negligence, section 343. "If the owner is aware that persons are in the habit of passing over his grounds, trespassers though they may be, he is liable if he leaves in their way dangerous instruments by which they are injured." Wharton, Negligence, section 824a. "The severity of the rule as to trespassers upon railroad property is essentially relaxed in the case of trespassers of tender years." Beach, Contributory Negligence, 204. "A well-grounded exception to the general rule is that one who artificially brings or creates upon his own premises any dangerous thing, which, from its nature, has a tendency to attract the childish instincts of children to play with it, is bound as a mere matter of social duty to take such precautions as the circumstances admit, to the end that they may be protected from injury while so playing with it or coming in its vicinity." Thompson, Negligence, 1204. Referring to the rule which prevails in Massachusetts and New York, Mr. Thompson further says: "This cruel and wicked doctrine, unworthy of a civilized jurisprudence, puts property above humanity, leaves entirely out of view the tender years and infirmity of understanding of the child,—indeed, his inability to be a trespasser in sound legal theory,—and visits upon him the consequences of his trespass, just as though he were an adult." Thompson, Negligence, section 1026. "The rule seems to be well settled that one who recklessly and without necessity leaves exposed dangerous things by meddling with which ignorant persons or infants may be injured, is liable for such injuries, although in so doing the injured person was a trespasser." Buswell, Personal Injuries, section 75. "It is apprehended that this rule rests on the general principle * * * expressed in the maxim, 'Sic utere,' etc." Buswell, Personal Injuries, section 76. "But where dangerous instrumentalities, in their nature attractive to children, are left in an exposed and accessible place where children are likely to

be, the law is well settled that the proprietor cannot shield himself in an action for injuries caused thereby to an infant by showing that the machine or article was not dangerous in itself, and would have done no harm if the plaintiff had not meddled with it." Barrows, Negligence, page 69. The turntable cases are described as "settled law of the country," in 1 Shearman & Redfield, Negligence (5th Ed.) 73. "The owner of land where children are allowed or accustomed to play, particularly if it is unfenced, must use ordinary care to keep it in a safe condition; for they, being without judgment, and likely to be drawn by childish curiosity into places of danger, are not to be classed with trespassers, idlers, and mere licensees." 2 Shearman & Redfield, Negligence (5th Ed.) 122. "The owner of any machine which he knows to be dangerous to children too young to know the danger, and of too immature judgment and discretion to control their natural instinct to amuse themselves with anything that may attract them as a plaything, and which he knows or ought to know may attract them, and he knows that it is so placed that it does attract them to play with it, is under a duty to such children to exercise the degree of care which an ordinarily prudent person would use to prevent its injuring them. Whoever, therefore, does anything in or immediately adjacent to a public street, park, or locality where children may rightfully congregate and are accustomed to do so, calculated to attract children into danger which they cannot appreciate, or are too young and inexperienced to resist, owes them the imposed duty of protecting them against the temptation he places before them by suitably guarding the source of danger." 1 Ray, Negligence Imposed Duties, 28. "It is said that one owes no duty to a trespasser. Is this true as to a young child, known to be in danger of being injured? Is there not an active duty owing to protect the helpless child from known dangers on one's own land? If this duty exists, then the doctrine laid down in the New Hampshire cases cannot be true. * * * The real question is not whether

the duty is owing the child which under the same circumstances would not be owing a grown person, but, putting the case personally, whether, knowing that an act of yours is liable to induce any one else to expose himself to danger, is it not your duty to anticipate such action on his part, and use care to avoid injuring him?" 1 Ray, Negligence Imposed Duties, 28. A railroad company "may incur liabilities for injuries to children by leaving dangerous machinery where it is accessible to them, although it would not, under the same circumstances, be liable to an adult." Pierce, Railroads, 336. "The law requires of persons having in their custody instruments of danger that they should keep them with the utmost care." 1 Hilliard, Torts (3d Ed.) 127; Pollock Torts, 407. "The duties which men owe to each other are made greater by their greater needs." Bishop, Noncontract Law, 589. "A child too young to be controlled by its reason, therefore, not improperly led by its instincts, receives from the law the protection which its special nature requires. For example, a man who leaves on his own ground, open to a highway, or upon or beside any public place, a dangerous machine likely to attract children, will be liable to one injured while playing with it, if he neglected precautions against such an accident." Bishop, Noncontract Law, section 854. "There is a manifest tendency in the cases to recognize the duty of the owner of the premises and instrumentalities to avoid doing harm to other persons, even though they be wrongdoers." 2 Jaggard, Torts, 890. "Extreme youth of a child is always an important fact bearing upon the question of negligence in the party by whose act or neglect he is injured." Cooley, Torts (2d Ed.) 822. "Leaving a tempting thing for children to play with, exposed where they would be likely to gather for that purpose, may be equivalent to an invitation to them to make use of it." Cooley, Torts, 356. "Children, being incapable, at a tender age, of exercising the same care and discretion as an adult, are entitled to more consideration, and the greater degree of care should be exercised to avoid

injuring them." Harris, Damages Corporation, 436. Speaking of the turntable cases: "These cases have been the subject of some severe criticism, but we are inclined to think the doctrine finds support both in principle and authority. A man's dominion over his own land is not entirely absolute, but is qualified by that time honored maxim, *'Sic utere,'* etc." 2 Wood, Railway Law, 1291. "A party's liability to trespassers depends on the former's contemplation of the likelihood of their presence on the premises and the probability of injuries from contact with conditions existing thereon. As a rule, a party will not be deemed to anticipate the commission of a willful wrong; yet where, under the circumstances, a technical trespass may reasonably be anticipated, the owner of premises will be liable for a failure to take reasonable precautions to prevent injuries to trespassers." Watson, Damages, page 288. "The doctrine of the weight of authority seems to be that the owner of uninclosed premises of a situation and character calculated to attract children thereupon is liable in damages if such premises are maintained in a condition liable to cause injuries to infant trespassers, and injuries in fact result from such negligent condition." Watson, Damages, page 290.

There is an opinion in an early Ohio case (*Kerwhaker v. Railroad Co.,* 3 Ohio St. 172 (62 Am. Dec. 246), which is in itself a very learned and exhaustive commentary on some phases of the law of the case before us. It was called forth by the destruction of a farmer's trespassing pigs upon a railroad track, and we may therefore hope the law it announces is none too good to be invoked in behalf of children. "A maxim of the law, tested by the wisdom of centuries, exacts of every person in the enjoyment of his property the duty of so using his own as not to injure the property of his neighbor. It is in accord with this principle that it has been held that, though a person do a lawful thing, yet, if any damage thereby befalls another, which he could have avoided

by reasonable and proper care, he shall make reparation. * * * The right of the defendant to the free, exclusive and unmolested use of its railroad is nothing more or less than the right of every land proprietor in the actual use and occupancy of his lands, and does not exempt it from the duty imposed by law upon every person to so use his own property as not to do any unnecessary injury to another."

A doctrine which numbers among its adherents such names as Denman, Cockburn, Dillon, Harlan, Cooley, and the other distinguished jurists and law writers, whose opinions and works we have made reference to, is not to be easily discredited.

II.  It is urged by the defendant that its turntable is admitted to have been fastened, and therefore no negligence is shown upon its part.  It is our opinion that, under the evidence, the question of the fastening was still a matter for the consideration of the jury.  The exact description of the method employed is not shown in the abstract, and it is proved that it was unfastened by one of the little girls in the party with plaintiff.  If there was any duty upon defendant to fasten or secure the table to prevent it being revolved by children, it must necessarily follow that the fastening employed should be reasonably sufficient for that purpose, and such sufficiency is peculiarly a question of fact.  Such, with one exception, seems to be the holding of all the courts which have passed upon this proposition.  This does not require the company to furnish the best or most perfect fastening, or to make the table absolutely secure, but simply that it shall exercise the care of an ordinarily prudent and cautious person under the circumstances as they then existed.  *Kolti v. Railroad Co., supra.*  "If the owner [of a turntable], instead of preventing such children getting to it, relies to prevent injury to them upon fastening it so as to prevent them playing with it, it is evident that the character of the means used for that purpose must be considered.  * * * If such means have no tendency to prevent

them so exposing themselves; if they are entirely futile, and leave the machine just as dangerous to such children as before,—it can hardly be said he has used the degree of care required of him. * * * Certainly the mere fact that it used some fastening would not, without regard to the character of it, absolve the company from liability." *O'Malley v. Railroad Co.,* 43 Minn. 239 (45 N. W. Rep. 440). In the same case it was said: "It may be taken as established by the evidence that the method adopted for fastening the turntable was that ordinarily used by railroad companies." But this fact was held not sufficient to permit the court to pass upon the sufficiency of such fastening as a matter of law. In *Navigation Co. v. Hedrick, supra,* the turntable was fastened or tied with a rope, which was cut or removed by children; and the question of defendant's care was held to be one for the jury. Such, also, was the holding in *Barrett v. Railroad Co., supra,* where it is said: "The fact that the turntable was latched in the way such turntables are usually fastened, or according to the usual custom of other railroads, although a matter which the jury had a right to consider, * * * was not of itself conclusive of the exercise of due care." To the same effect, see *Callahan v. Railroad Co., supra.* Further, to the effect that proof of the customary method of fastening is not conclusive. *Kelly v. Railroad Co.,* 28 Minn. 98 (9 N. W. Rep. 588).

III.   Appellant also contends that plaintiff was guilty of contributory negligence, and therefore cannot recover. Whatever may have been the rule in earlier times, and whatever may be the holding still in a few states, it is now established beyond all question in this country that a child cannot be held to any greater degree of care than may reasonably be expected from its years, experience, and intelligence, and that it cannot be charged by imputation with the negligence of its parents or guardians. This doctrine is so reasonable, and so consonant with the spirit of justice which pervades the law, that it commands our respect and observ-

ance; and if, as claimed, there be precedents for halding infants of five to seven years of age guilty of negligence as a matter of law, we have only to say they do not commend themselves to our reason or judgment. Whether the plaintiff was of sufficient age and intelligence to appreciate the danger to which she exposed herself in going upon the turntable was properly left to the jury. *Dowd v. Inhabitants of Chicopee,* 116 Mass. 93; *Plumley v. Bige,* 124 Mass. 57 (26 Am. Rep. 645); *Kay v. Railroad Co.,* 65 Pa. 269 (3 Am. Rep. 628); *Railroad Co. v. Becker,* 84 Ill. 483.

IV. It is finally said that the negligence, if any, of the defendant, was not the primary cause of the injury complained of, and that no injury would have occurred had not a third person removed the fastening, and still another revolved the table. This contention is not supported by the authorities. In the very nature of things, a child cannot well be injured upon a turntable without the intervention of some other person to revolve the machine. In the very first of the leading cases we have cited—*Lynch v. Nurdin*—this element was presented and urged as a defense without avail. The company's negligence, if it exist, is in the leaving, without proper care, of a dangerous instrument, in the place where it might reasonably have expected children to resort and put it in motion to the injury of themselves or others. See *Railroad Co. v. McDonald, supra; Clark v. Chambers, supra; Masser v. Railroad Co.,* 68 Iowa, 602; *Nagel v. Railroad Co., supra.*

The several questions discussed sufficiently dispose of other legal propositions raised by the appeal. The charge of the trial court to the jury was in substantial harmony with the opinions we have expressed, and the objections made thereto are not well taken. We are aware that the doctrine announced by this decision holds railroad companies to what may be thought an irksome responsibility. It is inevitable that in the rush and haste with which the business of rail-

roading is performed, and the handling and care of ponder-
ous machinery, the movements of which cannot be instantly
controlled, accidents will happen, by which both old and
young are maimed or killed, without any fault being justly
chargeable to the company or its employes, and in such cases,
of course, no action lies. But the very fact that the business
and appliances are of such dangerous nature imposes a cor-
responding obligation to avoid casualties which reasonable
care may anticipate and guard against. Reasonable care
may, at times, seem to be a burden, but its enforced observ-
ance is never a wrong, whether applied to railroad companies
or to individuals. If it be observed, no liability follows; if
it be neglected, it is simple justice that reparation be made
to one who is thereby injured.

The judgment of the district court is AFFIRMED.